OSBORNE et al. v. McDONALD et al.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1909.)

No. 1,592.

DESCENT AND DISTRIBUTION (§ 71*)—HEIRSHIP—EVIDENCE—WEIGHT AND SUF-
FICIENCY.

    Evidence considered in a suit to recover the estate of a decedent, and
*held* insufficient to establish the fact that complainants were legal heirs
of decedent, where it consisted largely of family tradition that the grand-
father of the older generation of complainants married a second time and
had a son, of the same name as decedent, who had not been heard from
for nearly 50 years, and there was no evidence of such marriage or of
the name or identity of the second wife, if any.

    [Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig.
§ 235; Dec. Dig. § 71.*]

Appeal from the Circuit Court of the United States for the North-
ern Division of the Western District of Washington.

For opinion below, see 159 Fed. 791.

In Equity. This is a suit brought by the complainants against the
executors and trustees of the last will of James Osborne, deceased,
and the city of Seattle, a municipal corporation, for the recovery of
the residue of the estate left by said James Osborne, deceased. The
complainants claim to be the only surviving heirs at law of said James
Osborne, deceased, and entitled to said residue under the laws of the
territory of Washington in force in said territory at the time of the
decease of said James Osborne in the month of December, 1881.

Chas. K. Jenner and Solon T. Williams (Harrison Bostwick, of
counsel), for appellants.

Chas. F. Munday, for appellees executors and trustees.

Scott Calhoun, for appellee City of Seattle.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). James
Osborne died, testate, in the city of Seattle, in the then territory, now
the state, of Washington, in the month of December, 1881, and left
real and personal property of considerable value, which he disposed of
by his will, providing for funeral expenses and the expenses of his
last sickness; the payment of his debts; making certain bequests to
his partner in business and others; and the residue of his estate, both
real and personal, he gave to his executors named in the will, and
to their successors in office, in trust, for the purpose of converting
the same into ready money and creating a fund which should be kept
at interest until expended as directed in the will. After the residue
of the estate had been converted into money, the executors were to
propose to the city of Seattle to build a public hall for which the said
entire fund should be contributed, provided that the said city of
Seattle should contribute a like and equal sum. The proposition
was to be submitted annually until the same should be accepted by

the city of Seattle, and the wishes of the testator carried into effect. No relatives were recognized or provided for in the will. The appellants, as complainants in the court below, claiming to be heirs of the deceased, filed their amended bill in equity in the Circuit Court on April 21, 1906, praying that they be adjudged sole heirs at law of the deceased (with the exception of certain other heirs mentioned and described in the amended bill of complaint).

The original bill of complaint is not in the transcript of record, but it appears to have been filed on June 12, 1905. The jurisdiction of the Circuit Court was invoked by the amended bill on the ground of diverse citizenship. The defendants demurred to the amended bill of complaint, and entered their pleas to the jurisdiction on the grounds that certain of the complainants and one of the defendants were citizens of the state of California. Thereupon complainants moved to dismiss out of the case the complainants who were citizens of the state of California. This motion was granted, and the demurrers on other grounds overruled. The defendants answered alleging, among other things, that they had no knowledge or information sufficient to base a belief as to whether the complainants were heirs of the said James Osborne, or whether the said James Osborne left surviving any heirs at all, and upon the evidence taken in the case the court below was of the opinion that the heirship of the complainants had not been established as required by law, and accordingly dismissed the bill.

James Osborne was never married. The complainants claiming as his heirs trace their descent from five children of one Abraham Osborne by a first marriage, and claim that James Osborne was a son of Abraham Osborne by a second marriage. The five children of Abraham Osborne, through whom complainants trace their relationship to James Osborne, were Caroline (Doty), Horace, Lewis K., Solomon E., and Clark H. Where these children were born does not appear from the evidence, but a reasonable inference drawn from the testimony is that they were born near New York City, at or near Tremont, in the neighborhood of the Bronx. The evidence indicates that Caroline was born in 1807. Horace was older than Lewis K., but the year of his birth is not stated. The latter was born in August, 1812. Solomon E. was born in 1814, and Clark H. in 1819. All these children of Abraham Osborne are dead. The testimony in support of complainants' case comes mainly, therefore, from grandchildren and great-grandchildren of Abraham Osborne, who testify concerning the declarations of deceased persons as to their residence, and relationships by blood and marriage. The deposition of William E. Osborne, a son of Solomon E. Osborne, residing in Brooklyn, N. Y., was read at the hearing. He was asked if he knew, from information derived from statements made by his father and uncles, where and with whom his father and his uncles lived in their boyhood days, or by whom they were raised. He replied that they were very young when their mother died, and their father turned them over to their uncle Northrop, and he brought them up. This Uncle Northrop lived at North Salem, Conn. The witnesses further testified that, while

these children were living with their uncle, their father, Abraham Osborne, was living in New York, down near Tremont, in the neighborhood of the Bronx. He was asked if he knew where Abraham Osborne lived after this alleged second marriage. He said, "I think he lived in that neighborhood somewheres." He was asked if he was sure he did not live in New York City. His answer was, "Well, in New York, but I would not say positively New York City; I know it was somewhere in New York." S. Wallace Osborne, also a son of Solomon E. Osborne, residing at East Norwalk, Conn., stated in his deposition that the boys of Abraham Osborne went to live with their Uncle Northrop at North Salem, and stayed with their uncle until they were 21. They all learned the trades of masons. This witness was asked why his grandfather left the boys when they went to live with their uncle. The witness replied that he thought it was because his grandfather got married again. He also testified that when Northrop Osborne had the children of Abraham Osborne, with whom he lived at North Salem, he had heard his father say that Abraham Osborne lived in New York City. This witness, whose deposition was taken in October, 1906, was asked whether he had any means or knowledge whereby he could approximately fix the time of his grandmother's death. He replied that she had been dead about 80 years. This statement would fix the date of her death about the year 1826.

The deposition of Annie Doty was taken. She is the widow of Lewis W. Doty, a son of Caroline Doty, who was the daughter and eldest child of Abraham Osborne. The witness testified that the mother of Caroline Doty, the wife of Abraham Osborne, died at Christie street, New York City, when Caroline Doty was 15 years of age. This statement would fix the year of her death in 1822. This witness was asked if she knew where Abraham Osborne was living during the greater part of his life. She replied she thought he lived in Danbury, but the longest period they knew of he lived in New York. She did not know where he went from New York—whether south or west—but she knew he went away.

Turning now to the testimony relating to James Osborne in the state of Washington, we find that the evidence tends to show that he was born in 1835; that he arrived at Puget Sound in 1859 or 1860, and was first located at Port Gamble, and a few years later he located at Seattle. Two witnesses were produced at the hearing who knew him in that locality, Lyman B. Andrews and Winfield S. Jameson, to whom he stated that he was from New York. Andrews testified that James Osborne told him that he was raised near New York City, Westchester county. The locality of the Bronx was mentioned. He said his mother had died before he left home. His father was still living at that time. He did not get along, and, having an opportunity to go to sea, he shipped for a voyage to Havre, France. He was gone three or four years. Returning home, he remained three or four months, then left for the Pacific Coast around Cape Horn. He landed in San Francisco, but afterwards went up to Port Gamble on Puget Sound. This was in 1859 or 1860.

Jameson testified that he heard James Osborne remark that he came from Westchester county, N. Y., the town of Morrisania. He spoke

of going to sea and making a voyage to France; witness thought he said Havre. He spoke of having come around the Horn to San Francisco in a sailing vessel, and from San Francisco to Port Gamble, also in a sailing vessel.

William Cauldwell, a journalist, residing in New York City, testified that he lived in Morrisania from 1849 to 1891; that he knew a man named Louis K. Osborne. (In referring to Louis or Lewis K. Osborne, we follow the record designating the person either as Lewis or Louis, as it there appears; but no point is made that this difference in the name indicates a different person.) He lived at Tremont, adjoining Morrisania, which was formerly called Upper Morrisania. This Louis K. Osborne had a relative named James Osborne. The witness thought he was a half-brother. About 1852 this James Osborne went away from Morrisania. He returned about 1857. He said he thought he would go to California. He did go away, and afterwards the witness received a letter from him written either from Sacramento or San Francisco. This was in 1859. He wrote he was going north to Puget Sound to a place the name of which was either Gambel, Gandlet, Gantel, or Gambul. The name was peculiar, and impressed itself upon the mind of the witness. The deposition of this witness was taken in October, 1906. He testified that he was then 77 years of age. He was therefore born about the year 1829. He testified that his intimacy with Louis K. Osborne was that of an esteemed personal acquaintance. "He and I," said the witness, "were both young at that time." The witness on cross-examination, indicated that the time referred to was in 1852 and 1853. The witness was at that time 23 or 24 years of age, and he testified that Louis K. Osborne was then 25 or 26 years of age. They were, therefore, as the witness testified, "both young at that time." The witness was asked if Louis K. Osborne was married at that time. He answered, "No, I do not think so." But the Lewis K. Osborne referred to in the testimony of the complainants as a son of Abraham Osborne and their relative was born in 1812, and in 1852 and 1853 he was 40 or 41 years of age. Here is a difference of 15 years in the age of the Louis K. Osborne whom Cauldwell knew, and the Lewis K. Osborne, the supposed half-brother of James Osborne. It is not probable that Cauldwell would make such a mistake, and the only reasonable inference is that they were not the same person. Furthermore, this Lewis K. Osborne who was the relative of the complainants became the father of a large family, and, by the testimony of his son Lewis D. Osborne, we are informed that he was married twice. By his first wife he had seven children, as follows: John W., Louis P., Winthrop, Richard, Caroline, Mary Elizabeth, and Eliza Elzea. By the second wife he had six children, as follows: Maggie (Sparks), William C., Minnie E. (Hegeman). Robert E., Lewis D., and George I. The evidence does not state when any of the children by the first wife were born. But the depositions of Minnie E. Hegeman, Robert E. Osborne, and Lewis D. Osborne, the children by the second wife, were taken in the case, and from their testimony we learn that Minnie E. Hegeman was born in 1859; Robert E. Osborne, 1860; and Lewis D. Os-

borne, 1867. Is it probable that the Louis K. Osborne who was 25 or 26 years of age in 1852 or 1853, and a single man, as testified to by Cauldwell, married and became the father of seven children, lost his wife, and was married the second time, and among the children by his second wife had a daughter born in 1859? We do not think so. There is evidently some mistake in the identity of this Lewis or Louis K. Osborne.

With respect to Abraham Osborne, the alleged father of James Osborne, the same uncertainty exists in his identification as the father of Lewis K. Osborne, the relative of the complainants, and the father of James Osborne by a second wife. The evidence, as before stated, tends to show that James Osborne was born in 1835. His declarations were that he was from Westchester county, N. Y. The locality of the Bronx was mentioned, and also of Morrisania.

Extracts from a copy of a letter were read in evidence by the complainants. The copy was identified as being in the handwriting of Lewis K. Osborne, and was found among his papers. It was dated at Mobile, August 8, 1835. Lewis K. Osborne was then 23 years of age, and this is the year in which James Osborne was born. Following the date of the letter is this indorsement: "Copy of a letter written to my father residing in St. Louis, Missouri." Certain extracts from this letter are printed in the record, but the entire document was introduced in evidence, and is in the record filed in this court. Certain other portions of this copy of a letter are relevant to the question under consideration. After the indorsement as above, the letter proceeds:

"Dear Father: Years have rolled away in quick succession since I have been permitted to gaze upon that countenance whose very expression (to me) was always love. * * * I have since I wrote to the postmaster for information respecting you been looking with anxious eyes and waiting heart for an answer from you, but as yet have received none. I received a letter a few days ago from my dear brother Horace, and the anxiety of himself and friends for your welfare was of no small amount. They expressed a desire to hear from you, but still greater to see you. We anticipate and I hope we shall soon realize our present hopes of receiving some intelligence from you that will gladden our hearts. I want you to write to me as soon as you receive this and let me know what you are engaged in; also whether you are in prosperity or adversity, sickness or in health, &c–&c—and then I can communicate such intelligence to 'the friends at the north. I expect to remain in Mobile till next spring, and then if I am spared return home. The friends at the north are all well. I believe Caroline has lost one of her little girls. She has now a son and a daughter left, Lewis and Electa. She and Doty live together in harmony and love and are both members of the Baptist church. Aunt Clarriss makes it her home with them. If you should want to write to them, they live 117 Stanton St. Uncle Northrop has been buying and selling property almost every year since you left. He has now bought Landlord Close's place, farm and all, and is now living on it. All three of the boys are with him, and he has acted in the capacity of a father to us all for which he deserves the highest praise. Aunt Rosalinda also has been as a mother to us. Heaven award them for their deeds of charity.                                    [Signed] Lewis K. Osborne."

If James Osborne was the son of Abraham Osborne by his second wife and was born in Morrisania, N. Y., in 1835, as claimed by the complainants, how is it that the children of Abraham Osborne by his first wife did not know of his whereabouts at that time? His son

Lewis K. Osborne had not seen him for years, but apparently supposed he was in St. Louis in 1835. This son certainly had no knowledge of his father's second marriage. But if this Abraham Osborne had married a second time and lived in Morrisania, or in that neighborhood, would not his son Lewis K. and his other children have known that fact? Their old home was either there or in that neighborhood, and they would naturally have known if their father was there or in that vicinity, and if he had married a second time they would undoubtedly have known that fact. But he was not there if any reliance is to be placed in the statements contained in the copy of the letter written by Lewis K. Osborne to his father in 1835, and addressed to St. Louis, Mo. Years had rolled away since the writer had seen his father, and he was anxious about him. His children wanted to hear from him, still more to see him, and in the letter it is stated: "Uncle Northrop has been buying and selling property almost every year since you left." This must mean that Abraham had left his former residence in New York several years before, and was not in 1835 living in Morrisania, or in that neighborhood.

The deposition of Emma C. Osborne, the daughter of Clark H. Osborne, was read in evidence upon the hearing. She testified that her father told her that his father, Abraham Osborne, married a second time, and that when his stepmother was dying she sent for him, but he did not go. She was asked if from what her father told her she could determine her father's age at the time his stepmother sent for him. The witness replied that he was very young. She said it was before he was married; she could not tell just when. On cross-examination she was asked if she could approximate as to how old her father was at that time. The witness said: "No, but he was very young." She was asked: "Perhaps eight or ten?" She replied: "I don't know. He did not tell me his age, but it must have been when he was very young that she died." The witness was asked where her husband's stepmother was at that time. The witness replied: "No, I have heard she lived in New York City." Clark Osborne was born in 1819. James Osborne was born in 1835. If the latter was the son of Abraham Osborne by his second wife, she did not die until after the birth of James Osborne in 1835, and, if she sent for Clark Osborne when she was dying, Clark Osborne was at that time at least 16 years of age, and he was living with his Uncle Northrop at North Salem, Conn. It could hardly be said that he was very young in 1835; but the residence of Abraham Osborne, the father of Clark H. Osborne and Lewis K. Osborne, was unknown to the family at that time. He had been gone from New York for years. It was supposed by Lewis K. Osborne that he was in St. Louis; but his residence there was unknown, and the postmaster had been written to for information concerning him.

But the death of the second wife of Abraham Osborne may have occurred at a later date. The difficulty in the way of this supposition is that Clark Osborne would cease to be very young, if he had not already passed that period in 1835. Moreover, the witness had heard that this second wife of Abraham Osborne's lived in New York City,

while the claim is that James Osborne was born in Morrisania. It is manifest that the incident which this witness relates as coming from her father concerning the second wife of Abraham Osborne cannot be reconciled with the other facts in the case.

In the deposition of Miranda M. Osborne, the wife of S. Wallace Osborne, who was a son of Solomon E. Osborne, the witness testified that from information derived from statements made by Solomon E. Osborne and Lewis K. Osborne their father, Abraham Osborne, married a second time. Being asked how many children were born by the second marriage, she replied she never heard of more than one boy. She did not know his Christian name. Heard he ran away and went to sea. This witness resided at East Norwalk, Conn.

In the deposition of Mrs. Henry T. Burtis, the daughter of James H. Burtis and the granddaughter of Horace Osborne, the witness testified that she had heard in her father's family that her grandfather, Abraham Osborne, married a second time, and had issue a boy named James, who ran away and went to sea. This witness resided at West Norwalk, Conn.

In the deposition of Mrs. Elbert Brinckerhoff, a stepdaughter of James H. Osborne, the witness testified that she was acquainted with Rosalinda, the widow of Northrop Osborne. She was asked if she had heard from Rosalinda Osborne, or any of the direct members of the Osborne family, that Abraham Osborne married a second time. She replied that she had. She heard Rosalinda Osborne make such a remark, and relates the circumstances. She says:

"The occasion of the conversation between mother and Rosalinda Osborne was the old lady's straitened circumstances, she having lost her property, and being dependent upon her own resources, and she wanted to know why some members of the family which she had reared, meaning the Osborne brothers, did not help her. Her own family were all girls, but Northrop Osborne brought up the boys and taught each one their trade. She said they were all well to do, and it seemed as though they could help her so that she would not have to work in her old age. Then there was another child, and she, speaking confidentially to my mother, wanted to know how he was situated. She had heard that he went west, and, if my brother knew where he was, she would like to know whether he was doing well."

This witness lived at New Canaan, Conn.

In the deposition of Mrs. Dena Osborne, the wife of William E. Osborne, who was the son of Solomon E. Osborne, the witness testified that she had heard her father-in-law say that his father had a second wife; heard him talk of a son of his father by this second marriage; heard him say his name was James. This witness resided in Brooklyn, N. Y.

In the deposition of William E. Osborne, a son of Solomon E. Osborne, the witness testified that, from information obtained from his family, his grandfather, Abraham Osborne, married a second time. There was a child born from this second marriage, and he heard him spoken of as James. Heard his father say that his boy went away when he was about 16 years of age—between 16 and 17—and that nothing was heard of him from that time to the time he was telling the story. This witness resided at Brooklyn, N. Y.

In the deposition of James R. Gray, who was not a member of the family, the witness testified that he formerly lived in Morrisania, and that he knew a Louis K. Osborne who lived in Morrisania during 1850 and 1860. He had a wife who was crippled by being scalded, and she could not get out of the bed without help. It was part of the duty of the witness to help lift her, and he used to go and help the husband lift her out of bed. This Louis K. Osborne had a brother named James, who traveled a good deal. Witness believed he went a number of times; but would come back and stay a while, and then go again. This witness was not certain that he had ever been introduced to him.

Were the Osbornes referred to in the testimony of the witness Gray the same Osbornes referred to in the testimony of the witness Cauldwell? Both witnesses said that the Louis K. Osborne they knew lived in Morrisania between 1850 and 1860. But the Louis K. Osborne referred to in the testimony of the witness Gray had a wife who was crippled by being scalded so that she could not get out of bed without help, while the Louis K. Osborne referred to in the testimony of the witness Cauldwell was a young man of 25 or 26 years of age, and, the witness thought, was unmarried. The first Louis K. Osborne had a brother who traveled a great deal. The witness believed he went a number of times. He would come back, stay a while, and then go again. The second Louis K. Osborne had a relative whom the witness Cauldwell thought was a half-brother. This half-brother went away in 1852 and returned in 1857. He never made any other trips away from there but this one. He afterwards went away. Said he was going to California. In the testimony of William E. Osborne he referred to a James Osborne, who, his father said, went away when he was about 16 or 17 years of age, and nothing was heard of him from that time until the time his father was telling the story.

Conceding that in a case of this character the law is most liberal in admitting and construing evidence of a reputation of marriage and kinship of decedents, nevertheless this evidence by reputation must be reasonably certain as to the identity of the individuals with respect to whom the reputation of kinship is sought to be established. In this case the testimony is clearly insufficient to establish the identity of the Lewis or Louis K. Osborne who was a relative of the complainants, or the identity of James Osborne, who was the half-brother of Lewis or Louis K. Osborne, the relative of the complainants; and the testimony is equally insufficient if it does not positively refute the claim of the complainants that their ancestor, Abraham Osborne, was by a second wife the father of James Osborne who was born in Morrisania in 1835 and died in Seattle in 1881. We know nothing whatever of this second wife. Her name is not given, and there is no information concerning her marriage to Abraham Osborne, nor is there any evidence of cohabitation or a reputation in the community where they resided or had their home that they were husband and wife, or that they were generally recognized and received as such by their neighbors and acquaintances. What there is at most is a mere tradition that Abraham Osborne was married a second time, and that by this second marriage there was issue a boy named James. In Stein v.

Bowman, 13 Pet. 209, 10 L. Ed. 129, the Supreme Court of the United States had before it a question as to the admission of testimony concerning such a tradition. The court said:

"It is not every statement or tradition in a family that can be admitted as evidence; the tradition must be from persons having such a connection with the party to whom it relates that it is natural and likely, from their domestic habits and connections, that they are speaking the truth, and that they could not be mistaken."

In this case we are asked to give credence to a tradition without any substantial identity as to the person who is supposed to have become the second wife, and there are no facts stated from which we can infer that the tradition comes from persons who could not be mistaken.

In any view of the testimony, we are of the opinion that the complainants have failed to establish their right to be adjudged the legal heirs to the estate of James Osborne herein. The decree of the Circuit Court is therefore affirmed.